**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS WARD, | ) | CASE NO. 5:17CV1124 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Thomas Ward, ("Plaintiff" or "Ward"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. §§ 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42

U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to

an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the

reasons set forth below, the Magistrate Judge recommends the Commissioner's final decision be

VACATED and the case REMANDED for further proceedings consistent with this opinion.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.   PROCEDURAL HISTORY

In February 2013, Ward filed an application for SSI, alleging a disability onset date of August 31, 2006, and claiming he was disabled due to depression, poor memory, "concentration and balance," post-traumatic stress disorder ("PTSD"), "metal rods in right foot/ankle," lower back pain, and arthritis.  (Transcript ("Tr.") 347, 393.)  The applications were denied initially and upon reconsideration, and Ward requested a hearing before an administrative law judge ("ALJ").  (Tr. 211, 225, 230.)

On May 28, 2015, an ALJ held a hearing, during which Ward, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 2-51.)  On September 8, 2015, the ALJ issued a written decision finding Ward was not disabled.  (Tr. 103-123.)  The ALJ' s decision became final on March 28, 2017, when the Appeals Council declined further review.  (Tr. 52.)

On May 30, 2017, Ward filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11 & 12.)  Ward  asserts the following assignment of error:

> (1) Whether the Administrative Law Judge ("ALJ") erred in evaluating the Plaintiff's credibility.

(Doc. No. 11.)

# II.   EVIDENCE

## A.   Personal and Vocational Evidence

Ward was born in March 1972 and was 43 years-old at the time of his administrative hearing, making him a "younger" person under social security regulations.  (Tr. 116.)  *See* 20 C.F.R. § 416.963(c).  He has a high school education and is able to communicate in English.  (*Id.*)  He has past relevant work as a landscape laborer.  (*Id.*)

2

**B.** **Medical Evidence**[2]

On August 25, 2006, Ward visited his psychiatrist, William Fikter, M.D., for his

psychiatric medications.  (Tr. 443.)  Dr. Fikter noted Ward had a bright affect, was compliant and

motivated, but had "less than optimal control of symptoms."  (*Id.*)  He listed Ward's diagnoses as

major depression; attention deficit hyperactivity disorder ("ADHD"); and history of psychosis.

(*Id.*)  He assigned Ward a global assessment of functioning ("GAF")[3] score of 45, indicating

serious symptoms.  (*Id.*)

Ward returned to Dr. Fikter on September 14, 2006, indicating moodiness and social

isolation.  (Tr. 439.)  Dr. Fikter adjusted Ward's medications accordingly.  (*Id.*)  On January 4,

2007, Dr. Fikter noted Ward was doing "reasonably okay."  (Tr. 435.)  Ward described anger

issues and anxiety.  (*Id.*)  Dr. Fikter renewed his prescriptions.  (*Id.*)

On September 16, 2010, Ward underwent a psychiatric evaluation with Dr. Fikter.  (Tr.

540.)  Dr. Fikter noted Ward last received counseling four years ago.  (*Id.*)  Ward indicated he

was doing "reasonably well" on his medications for depression, anxiety, mood swings, and pain.

(*Id.*)  Dr. Fikter noted Ward still had mood swings, but could handle stressors, and appeared calm

---

[2]     The Court notes its recitation of the medical evidence is not intended to be
exhaustive and is limited to the evidence cited in the parties' Briefs.

[3]     The GAF scale reports a clinician's assessment of an individual's overall level
of functioning.  An individual's GAF is rated between 0-100, with lower numbers
indicating more severe mental impairments.  A GAF score between 41 and 50
indicates serious symptoms or any serious impairment in social, occupational or
school functioning. A recent update of the DSM eliminated the GAF scale
because of "its conceptual lack of clarity . . . and questionable psychometrics in
routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders*
(DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

and bright.  (*Id.*)  Ward denied any suicidal ideation.  (*Id.*)  Dr. Fikter assessed a GAF score of 35, indicating a major impairment in functioning.  (Tr. 541.)

Ward visited Dr. Fikter on December 16, 2010, with increased anxiety after the death of his grandmother.  (Tr. 539.)  He described racing thoughts, but a stable mood and normal sleep. (*Id.*)  Dr. Fikter noted Ward was bright and cooperative, with good eye contact.  (*Id.*)  He assessed a GAF score range of 35-40.  (*Id.*)

On August 4, 2011, Ward reported increasing social isolation and stress.  (Tr. 537.)  Dr. Fikter noted Ward was "more subdued than previously," but with good eye contact.  (*Id.*)  He assessed a GAF score of 40.  (*Id.*)

Ward presented to his primary care doctor, John Tumbush, D.O., on August 18, 2011. (Tr. 485.)  He indicated he recently visited the emergency room due to lethargy and confusion, but the hospital work up was negative.  (*Id.*)  Dr. Tumbush speculated Ward had not taken his medications properly that day.  (*Id.*)

On November 21, 2011, Ward contacted Dr. Tumbush's office.  (Tr. 477.)  He was having "significant difficulty without Lyrica," as his back pain increased.  (*Id.*)  Dr. Tumbush noted Ward was "very stable from a psychiatric standpoint," but also noted in the past, he had "threatened the president of [the] United States and had the CIA following him and his family." (*Id.*)

Ward visited the emergency room on April 19, 2012 for insomnia.  (Tr. 464.)  The emergency room physician provided him with Vistaril and encouraged him to follow up with his primary care provider.  (*Id.*)

Ward returned to the emergency room on September 12, 2012, indicating insomnia for the

4

past 7-10 days.  (Tr. 460.)  He denied suicidal ideation and hallucinations, and his physical examination was normal.  (*Id*.)  He was able to answer questions appropriately.  (*Id*.)  The emergency room physician again provided Ward with Vistaril.  (*Id*.)  On December 18, 2012, Ward again presented to the emergency room, with insomnia, along with an itchy rash.  (Tr. 458.)  He had no rash on examination, and the emergency room physician speculated there was a psychiatric component to his physical complaints.  (*Id*.)  Ward was again provided with Vistaril. (*Id.*)

On December 20, 2012, Dr. Fikter indicated Ward was doing "reasonably well," and noted some criminal charges Ward had been facing were dropped.  (Tr. 526.)  Dr. Fikter made a notation that Ward's family, including Ward, had mental health issues with "varying degrees of symptom control."  (*Id*.)  He assessed a GAF score of 40.  (*Id*.)

On January 15, 2013, Ward presented to the emergency room after overdosing on Lyrica. (Tr. 455.)  However, he denied suicidal ideation.  (*Id*.)  The emergency room staff discussed his condition with his parents, and his mother disclosed she was currently administering some of his medications.  (*Id*.)  She agreed to control all his medications from now on.  (*Id*.)  Ward did not require hospitalization.  (*Id.*)

On February 8, 2013, Ward saw counselor Zara Geiger, ATR, PCC, for a counseling session.  (Tr. 608.)  He had a normal affect, good eye contact, and was engaged and receptive. (*Id*.)  He indicated he was struggling to cope with stressors and his mother was currently dispensing his medications.  (*Id*.)

Ward saw Dr. Fikter on February 21, 2013, reporting episodes of "blacking out" since a recent motor vehicle accident.  (Tr. 553.)  On February 26, 2013, Ward consulted with

neurologist Mark Rorick, M.D., regarding these episodes.  (Tr. 564.)  He indicated that, during the past year, he had 2-3 of these episodes where he "does things and he does not remember." (*Id.*)  Ward disclosed a history of multiple concussions and drug use.  (*Id.*)  Ward also described an incident where he had used Ephedra, a fat burning supplement, and saw spots while running on the treadmill.  (*Id.*)  During the examination, Ward had difficulty completing serial seven subtractions, but a normal motor examination.  (Tr. 565.)  Dr. Rorick ordered a brain MRI and an EEG.  (*Id.*)

On February 28, 2013, Ward returned to Dr. Tumbush, reporting more of these episodes. (Tr. 1171.)  He also reported continued depression and "daydreams" about his time in the military.  (*Id.*)  Ward relayed he had been running for exercise.  (*Id.*)  On examination, he was mildly anxious.  (*Id.*)  Dr. Tumbush encouraged Ward to follow up with his neurologist and psychiatrist.  (*Id.*)

Ward saw Ms. Geiger for counseling on March 1, 2013, and described recurrent thoughts about his time in military bootcamp.  (Tr. 609.)  Ms. Geiger noted Ward was struggling to cope with depression.  (*Id.*)

Ward returned to Dr. Rorick on March 18, 2013 to review his MRI and EEG results.  (Tr. 558.)  His brain MRI revealed a left pterygopalatine fossa cystic appearing lesion, which was stable compared to a 2011 MRI.  (*Id.*)  There were no other abnormalities in his brain MRI and his EEG was normal.  (*Id.*)  Dr. Rorick concluded his episodes were possibly seizures, but the MRI findings were likely benign.  (*Id.*)  He scheduled Ward for a follow up MRI in December 2013.  (*Id.*)

On March 22, 2013, Ward received counseling with Ms. Geiger.  (Tr. 610.)  During the

counseling session, Ms. Geiger noted Ward's speech was tangential and off-topic. (*Id.*) He also was agitated and struggled to remain in his chair. (*Id.*) Ward denied any suicidal ideation, but indicated he had thoughts he would be "better off dead." (*Id.*) Ward returned to Ms. Geiger on May 20, 2013, and described increased stress and depression. (Tr. 612.)

Subsequently, Ward was hospitalized for psychosis, suicidal ideation, and paranoia from June 13 – 26, 2013. (Tr. 685.) During the hospitalization, Ward's medications were adjusted and his symptoms improved. (Tr. 686.) On discharge, the hospital physicians noted Ward "continues to appear to have more insight into appropriate reality testing and does not truly believe in the conspiracy against him which was present at [admission]. He denies believing he is under surveillance or being followed although [he] still does have some residual feelings." (Tr. 700.)

Ward followed up with Dr. Fikter on July 8, 2013. (Tr. 746.) Ward's condition was improved, as his mood, sleep, paranoia, and anxiety were all under better control. (*Id.*)

On September 23, 2013, Ward told Dr. Tumbush he was attempting to wean himself off of his medications. (Tr. 962.) Dr. Tumbush encouraged Ward to discuss this with his psychiatrist. (Tr. 965.) Ward reported he wanted to return to school to become a psychologist. (*Id.*) Dr. Tumbush, while noting Ward did not seem manic, felt Ward's "plans sound somewhat unrealistic considering his past." (*Id.*)

Ward visited Dr. Fikter on October 23, 2013, reporting anxiety over taking Ephedra 10 years ago. (Tr. 767.) Dr. Fikter assessed a GAF score of 40. (*Id.*) He returned to Dr. Fikter on January 13, 2014, with marked difficulty with sleep, ongoing anxiety, and poor concentration and memory. (Tr. 778.)

7

On February 14, 2014, Ward began treatment with primary care doctor William Ervine, D.O.  (Tr. 948.)  He reported increased sadness and apathy, as well as poor concentration and motivation.  (*Id.*)  His physical examination was normal.  (Tr. 950.)  Dr. Ervine diagnosed Ward with ADHD and bipolar disorder, and prescribed Methylphenidate for his ADHD.  (*Id.*)  Ward returned to Dr. Ervine on March 17, 2014, indicating improvement in his energy levels.  (Tr. 944.)  He relayed he had been jogging and visited Job and Family Services to discuss schooling options for becoming a locksmith.  (*Id.*)

On March 31, 2014, Ward indicated to Dr. Fikter he was questioning "whether he needs medication or not, or if all of his symptoms could be accounted for by the ephedrine he had taken as a young adult."  (Tr. 775.)  Dr. Fikter assessed a GAF score of 40.  (*Id.*)  Ward did discontinue one of his medications, as he wanted to "see if [he] could be normal off of medication and get a job."  (Tr. 774.)  However, he consequently became extremely anxious and paranoid.  (*Id.*)  Dr. Fiktar restarted his medications on June 5, 2014.  (*Id.*)

Ward visited Dr. Ervine on July 18, 2014 for headaches and occasional heart palpitations.  (Tr. 932.)  His physical examination was normal.  (Tr. 934.)  Dr. Ervine prescribed Ward headache medication.  (Tr. 935.)

On July 23, 2014, Ward visited the emergency room, with complaints of left arm weakness, numbness, headache, visual changes, and dizziness.  (Tr. 1117.)  His workup, including an EKG and CT scan of the head, was normal.  (*Id.*)

Ward saw Dr. Ervine on September 23, 2014 for a sinus infection and headache.  (Tr. 920.)  Dr. Ervine prescribed Ward ADHD medication, as well as a nasal spray.  (Tr. 923.)  On October 17, 2014, Ward returned to Dr. Ervine, reporting his "immune system is shutting down."

(Tr. 916.)  His physical examination was normal.  (Tr. 918.)  Dr. Ervine diagnosed lumbar spondylosis, nausea, and vomiting, and prescribed a course of steroids.  (Tr. 919.)

On October 19, 2014, Ward visited the emergency room for right flank pain and burning.  (Tr. 1112.)  On examination, he had no rash, his abdominal CT scan was normal, and his labwork was unremarkable.  (*Id*.)  The emergency room physician noted Ward "has multiple worries.  He stated he has some birthmarks on his body that he is not sure will turn into cancer or not."  (*Id*.)

Ward saw Dr. Ervine for emergency room follow up on November 3, 2014.  (Tr. 889.)  He requested a biopsy of a lesion on his right side.  (*Id*.)  Dr. Ervine excised the lesion.  (Tr. 892.)  On November 4, 2014, Ward visited Ravenwood Mental Health Center for counseling with Christine Appell, LSW.  (Tr. 881.)  He voiced concerns he had kidney cancer.  (*Id*.)  Ms. Appell confronted Ward, noting he often had a new physical complaint at each counseling session.  (*Id.*)  Ward responded he "knows" something physically was wrong with him.  (*Id*.)  Ms. Appell assessed a GAF score of 55, indicating moderate symptoms.  (Tr. 882.)

Ward saw Dr. Ervine on November 25, 2014 for a variety of complaints.  (Tr. 884.)  He reported he was having night sweats, fever, and an episode where he "blacked out."  (*Id*.)  He reported chest pain and shortness of breath since this episode.  (Tr. 885.)  His physical examination was normal, and Dr. Ervine encouraged Ward to follow up with his neurologist.  (Tr. 887-888.)

On December 7, 2014, Ward visited the emergency room for abdominal pain, after ingesting baking soda to "detox" his system.  (Tr. 1055.)  He indicated he may have kidney stones, though his labwork and abdominal CT scan were both normal.  (*Id*.)  Ward returned to the emergency room a few days later, on December 11, 2014, this time worrying about tumors.  (Tr.

1042.)  He underwent another workup, which was negative.  (*Id.*)

From December 12, 2015 through January 5, 2015, Ward was "pink slipped," i.e. involuntarily psychiatrically hospitalized.  (Tr. 1178.)  Following discharge, Ward reported no suicidal ideation.  (*Id.*)  However, he continued to fixate on his remote Ephedra use.  (*Id.*)

On January 13, 2015, Ward saw psychiatrist James Rodio, M.D. at the Ravenwood Mental Health Center.  (Tr. 1175.)  He reported periods of suicidal ideation, intrusive memories from his time at miliary boot camp, and poor concentration.  (*Id.*)  Dr. Rodio noted Ward, beyond his recent psychiatric hospitalization, had also been hospitalized in 2008, after threatening the president, and again in 2012.  (*Id.*)  Ward discussed his remote Ephedra use, stating "it's really a confusing thing with whatever happened when I took that stuff."  (*Id.*)  He also described THC use, as well as a history of experimenting with a variety of drugs.  (*Id.*)  Dr. Rodio noted Ward had less mood fluctuations with his current medications, and his thoughts were linear and reality based.  (*Id.*)  Dr. Rodio diagnosed THC dependance and bipolar affective disorder.  (*Id.*)  Ward returned to Dr. Rodio on February 25, 2015.  (Tr. 1173.)  Dr. Rodio renewed his medications, and advised him to return for followup in 8-10 weeks.  (*Id.*)

Ward was subsequently psychiatrically hospitalized from June 27 – July 10, 2015, after the police brought him to the emergency room.  (Tr. 1188.)  He admitted he had been noncompliant with medications, and had been drinking vinegar and baking soda in an attempt to "detoxify" himself.  (*Id.*)  He denied any suicidal ideation, but he had psychosomatic delusions regarding toxins in his body.  (*Id.*)  Ward's symptoms improved once he re-started his medications.  (*Id.*)  He was discharged to a nursing home for further care, as his parents indicated they could no longer care for him.  (*Id.*)  The hospital physicians noted Ward's poor insight, as he

10

did "not believe he has a mental illness." (*Id*.)

## C.     State Agency Reports

### 1.     Mental Impairments

On December 7, 2007,[4] Ward underwent a consultative examination with J. Joseph Konieczny, Ph.D. (Tr. 1023-1027.) Dr. Konieczny noted Ward was "somewhat lethargic" and "vague in presentation" during the evaluation. (Tr. 1023.) Ward described a history of special education, a minimal and sporadic work history, and high levels of anxiety. (Tr. 1024.) He reported poor temper control, mood swings, poor sleep, depression, occasional crying spells, and diminished motivation. (Tr. 1024-1025.) He denied any auditory or visual hallucinations. (Tr. 1025.) Dr. Konieczny noted Ward "seemed quite capable of expressing himself in a clear and coherent manner." (*Id*.) Dr. Konieczny administered IQ testing, and Ward received a full scale IQ score of 74, placing him in the borderline range of intellectual functioning. (Tr. 1026.) The doctor also administered memory testing, and Ward's scores ranged from the extremely low level to the low average level. (*Id*.)

Based upon this examination, Dr. Konieczny diagnosed Ward with Depressive Disorder, not otherwise specified; Borderline Intellectual Functioning; and Personality Disorder, not otherwise specified. (Tr. 1027.) He assessed a GAF score of 50, indicating serious symptoms. (*Id*.) Dr. Konieczny provided the following opinion regarding Ward:

> Thomas' ability to concentrate and to attend to tasks appears to be adequate.
> His ability to understand and to follow directions appears to be adequate.

---

[4]     The Court notes this consultative examination was conducted in connection with a prior application, and therefore, occurred well before Ward's February 20, 2013 application date. However, as Ward cites to this consultative examination in his brief, the Court will include it in its recitation of the evidence.

11

His ability to withstand stress and pressure shows indications of moderate impairment and would appear to reflect his personality disorder and his intellectual limitations.  Similarly, his ability to relate to others and to deal with the general public shows indications of moderate impairment.  His insight into his current situation seems fair to poor and reflective of his history and presentation.  He shows a significant degree of deficit in his awareness of rules of social judgment and conformity.  His overall level of judgment seems fair to poor.  Thomas currently resides with his mother, stepfather, and girlfriend and participates somewhat in routine daily household responsibilities.  He would appear to require some degree of supervision and monitoring in the management of daily activities and in the handling of his financial affairs.  His overall level of functioning is at a reduced level of efficiency.

(*Id*.)

On May 10, 2013, state agency physician Vicki Warren, Ph.D., reviewed Ward's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 153-154.)  Dr. Warren found Ward had moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (*Id*.)  Dr. Warren noted her opinion was an adoption of a prior August 24, 2011 ALJ decision.  (Tr. 154.)

Dr. Warren also completed a Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 157-159.)  Within this Assessment, Dr. Warren found Ward was not significantly limited in his abilities to (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or in proximity to others without being distracted by them; (7) make simple work-related decisions; (8) accept instructions and respond appropriately to criticism from supervisors; (9) get

12

along with coworkers or peers without distracting them or exhibiting behavioral extremes; (10)

maintain socially appropriate behavior and to adhere to basic standards of neatness and

cleanliness; (11) travel in unfamiliar places or use public transportation; and (12) set realistic

goals or make plans independently of others.  (*Id*.)  She found Ward was moderately limited in

his abilities to (1) understand and remember detailed instructions; (2) maintain attention and

concentration for extended periods; (3) complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods; (4) interact appropriately with the general

public; and (5) respond appropriately to changes in the work setting.  (*Id*.)  Dr. Warren found no

evidence of any limitation in Ward's ability to be aware of normal hazards and take appropriate

precautions.  (Tr. 158.)  Dr. Warren explained the basis of her decision as follows:

> Limited to [simple, routine tasks].
>
> ***
>
> Limited to superficial interaction with the public and occasional
> interaction with co-workers.
>
> ***
>
> Work setting free of fast pace workplace changes.
>
> ***
>
> The [mental residual functional capacity] is ad[sic] adoption of the
> ALJ decision dated 8/24/11 whcih[sic] is being adopted under AR 98-
> 4 (Drummond Ruling).

(Tr. 157-159.)

On September 13, 2013, state agency physician Tonnie Hoyle, Psy.D., reviewed Ward's

medical records and completed a PRT and Mental RFC assessment.  (Tr. 172-173, 176-178.)  Dr.

13

Hoyle affirmed Dr. Warren's assessments.  (*Id.*)

## 2. Physical Impairments

On October 1, 2013, Ward underwent a consultative examination with Mary-Helene Massullo, D.O.  (Tr. 754-758.)  Ward described anxiety, depression, memory loss, back pain, and a history of a right leg and ankle fracture.  (Tr. 754-755.)  He also described an incident of chest pain and visual disturbance while running on the treadmill after taking Ephedra.  (Tr. 755.)  He indicated he continued to have chest pain with anxiety, caffeine, and stress.  (*Id.*)  On examination, his gait was normal, and he was able to grasp and manipulate with each hand.  (Tr. 757.)  He had a normal range of motion in his joints, beyond a diminished range of motion in his right hip.  (*Id.*)  He had a positive straight leg raise on his right side.  (*Id.*)  During the course of the examination, Dr. Massullo noted Ward appeared "to be confused at times and appeared to be slow in responses because he apparently could not remember specifics."  (*Id.*)

Dr. Massullo offered the following conclusion regarding Ward:

Based upon my objective findings this patient is of working age and is not statutorily blind, the patient appears to not be able to do work related types of activities such as hearing, speaking, sitting, walking, standing, lifting and traveling using bilateral lower extremities.  He had a difficult time here today with simple questions and appears to be overtly confused with awareness of this and he has ongoing [chest pain] and this is brought on with stress and anxiety and caffeine.  The etiology of the acute changes which occurred while running on treadmill when 27 years of age might have been precipitated with the use of ephedra per patient but the etiology is undetermined and seems to have been a life changing event.

Mentally the patient appears questionably capable at the time of this examination.  He relates memory changes, forgetfulness and depression with anxiety and insomnia and I feel this should be evaluated further to denote his full capabilities.

(Tr. 758.)

14

On May 10, 2013, state agency physician Diane Manos, M.D., reviewed Ward's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 155-157.)  Dr. Manos concluded Ward could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday.  (Tr. 155.)  She further found Ward was limited to occasionally climbing ramps and stairs, never climbing ladders, ropes, or scaffolds, never balancing, and occasionally stooping, kneeling, crouching, and crawling.  (Tr. 155-156.)  Dr. Manos concluded Ward should avoid moderate exposure to extreme cold and extreme heat, and all exposure to hazards.  (Tr. 156.)

On October 2, 2013, state agency physician Gerald Klyop, M.D., reviewed Ward's medical records and completed a Physical RFC Assessment.  (Tr. 174-176.)  He adopted Dr. Manos' assessments.  (*Id.*)

**D.     Hearing Testimony**

During the May 28, 2015 hearing, Ward testified to the following:

- He lives with his parents.  (Tr. 9.)  He cleans his room, does laundry, cuts the grass, and generally helps around the house.  (Tr. 16.)

- He has back pain, his "stomach gets sick a lot," and he has "a hard time thinking and concentrating."  (Tr. 11.)  He recently developed balance problems, which makes it difficult to walk.  (Tr. 12.)  His doctor has not determined the etiology of his balance issues.  (*Id.*)

- He injured his ankle in 2007 during a dirt bike accident.  (*Id.*)  He had to undergo surgery, and has a metal plate, along with rods and pins, in his ankle and leg.  (Tr. 13.)  He can walk about 20-30 minutes.  (*Id.*)  He used to jog for exercise, but has not done so in 2-3 years.  (Tr. 41.)

- His stomach "bothers him."  (Tr. 16.)  He is often queasy and nauseous.  (*Id.*)  He has not spoken to his doctor about this problem.  (*Id.*)

15

- He had an incident on a treadmill, where he was running and began to see stars. (Tr. 17.) He stated he was taking Ephedrine, a fat burner supplement, at the time. (*Id.*) He stated he no longer takes Ephedrine, but ever since this incident, it "messed" him up, and he has not "been right." (*Id.*) He has a history of traumatic brain injuries, which he attributes to the Ephedrine. (Tr. 27.)

- He cannot work due to "thinking" and poor sleep. (Tr. 21.) He is "real shaky and nervous all the time." (*Id.*) He had difficulty in school. (Tr. 22.) He attempted community college, but was unsuccessful. (*Id.*)

- He currently is not seeing anyone for his mental health symptoms. (*Id.*) He has trouble driving to his counselor, and has not been in about a month. (*Id.*) He also has not been taking his medications recently. (Tr. 25.) His mother previously administered his medications to him, and he has "a hard time taking care of it." (Tr. 30.) Later in the hearing, he indicated his mother only managed his medications "a little bit." (Tr. 31.)

- He has not used marijuana "in a while." (Tr. 24.) He denies he is dependant upon it, but admitted he last used marijuana about two months prior. (*Id.*)

- He was briefly in the Army. (Tr. 26.) He came home from boot camp, and "something happened." (*Id.*) He "had all these visions and stuff like that." (*Id.*)

- He often goes to the emergency room because he is trying "to figure out the problem that happened to me." (Tr. 34.) He has ingested baking soda because he "thought it would make [him] feel better." (Tr. 35.) He also had a mole he was concerned about, but the workup was negative. (*Id.*) However, he knows "something's wrong" with him physically, despite multiple doctors finding no problems. (Tr. 35-36.)

- In 2013, he was having blackout episodes. (Tr. 39.) The doctors thought they were possibly seizures, but they were not "sure what exactly that was." (Tr. 40.) He has not had any of these episodes recently. (*Id.*)

The VE testified Ward had past work as a landscape laborer (D.O.T. #408.687-014). (Tr. 43.) The ALJ then posed the following hypothetical question:

Also assume that this hypothetical individual is limited to light[5] work. They

---

[5]   "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10

can never climb ladders, ropes, or scaffolds.  And the remaining posturals are at occasional.  Also, assume that this person can never balance. . . Foot control operations with the right foot is limited to occasional.  This hypothetical individual should avoid all exposure to extreme temperatures, wetness, and humidity.  They should avoid – also avoid all exposure to operational control of moving machinery, unprotected heights, or hazardous machinery.  First, also assume that this person would be limited to work that is simple and routine and repetitive tasks in a work environment free of fast-paced quota requirements involving only simple, work-related decisions, and few, if any, workplace changes.  And also, they would be limited to no interaction with the public and only occasional interaction with coworkers.

(Tr. 45-46.)

The VE testified the hypothetical individual would not be able to perform Ward's past work as landscape laborer.  (Tr. 46.)  The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as small products assembler (D.O.T. #739.687-030), housekeeping cleaner (D.O.T. #323.687-014), and inspector, hand packager (D.O.T. #559.687-074).  (Tr. 46-47.)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

---

pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since February 20, 2013, the application date (20 CFR 416.971 *et seq*.).

2.    The claimant has the following severe impairments: obesity, degenerative

joint disease (DJD) of the neck and lumbar spine, status post ankle fracture with internal fixation, gastroesophageal reflux disease (GERD), bipolar disorder also diagnosed as schizoaffective disorder, anxiety disorder, attention deficit disorder (ADD) also diagnosed as ADHD, posttraumatic stress disorder (PTSD), depressive disorder, and tetrahydrocannabinol (THC) dependance (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 416.967(b) except no climbing ladders, ropes, or scaffolds with all other posturals limited to occasional, except he may never balance.  Foot control operations with the right foot are limited to occasional.  He must avoid all exposure to extreme temperatures, wetness, humidity, operation and control of moving machinery, unprotected heights, and the use of hazardous machinery.  Additionally, he is limited to work comprised of simple, routine, and repetitive tasks; with no fast paced order requirements; involving simple work-related decisions; and few, if any, workplace changes.  He must not interact with public and may not more than occasionally interact with co-workers.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on March **, 1972 and was 40 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 20, 2013, the date the application was filed (20 CFR

416.920(g)).

(Tr. 109-117.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the

Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec*., 2011 WL 1228165 at

* 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made pursuant to

proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been

defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v.

Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and

Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are

supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*,

889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston

v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are

not subject to reversal, however, merely because there exists in the record substantial evidence to

support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203

F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion,

the decision of the Administrative Law Judge must stand if the evidence could reasonably

20

support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.        Assignment of Error: Credibility

In his sole assignment of error, Ward argues the ALJ erred in the evaluation of his credibility.  (Doc. No. 11 at 1.)  He maintains the "ALJ failed to appropriately address [his] symptoms and allegations concerning [his] debilitating symptoms in assessing his credibility." (*Id*. at 9.)  Ward asserts "the ALJ failed to consider any of the plaintiff's allegations because he concluded a single statement in the record from one office visit was inconsistent with a small portion of Plaintiff's testimony regarding jogging and the ability to sustain concentration to attend school, and therefore he was essentially untruthful in all of his allegations regarding the severity of his symptoms."  (*Id*. at 12.)  Ward concludes the failure of the ALJ to consider any of his allegations "deprives him of full and fair adjudication of his claim."  (*Id*.)

The Commissioner maintains the ALJ properly evaluated Ward's credibility.  (Doc. No. 12 at 1.)  She asserts Ward "cites a small portion of the ALJ's decision as the extent of his credibility," but "ignores the ALJ's discussion of the evidence throughout his decision."  (*Id*. at 15.)  The Commissioner argues the ALJ properly considered the inconsistencies between the testimony and the medical record, the lack of objective medical findings, and "evidence that his mental symptoms were adequately controlled and stabilized when he was compliant with treatments."  (*Id*.)  She asserts this "is not a case where the ALJ completely rejected Plaintiff's allegations," as the ALJ did significantly limit Ward's capacity to perform work.  (*Id*. at 16.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs*., 667 F.2d 524, 538 (6th Cir. 1981), cert. denied, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983).  When a

claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g, Massey v. Comm'r of Soc. Sec*., 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 96–7p, 1996 WL 374186 (July 2, 1996).[6] Essentially, the same test applies where the alleged symptom is pain, as

---

[6]    SSR 16-3p supercedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), which was in effect at the time of the May 28, 2015 hearing. Both Ward and the Commissioner suggest SSR 16-3p governs this case. (*See* Doc. No. 11 at 10; Doc. No. 12 at 13.) This Court has previously decided, in dicta, to apply SSR 16-3p retroactively. *See e.g., Anderson v. Berryhill*, 2017 WL 1326437 at fn 3 (N.D. Ohio March 2, 2017). Here, the parties do not address the application of SSR 16-3p versus SSR 96-7p. District courts within this Circuit have disagreed regarding the retroactivity of SSR 16-3p and the Sixth Circuit has not decided the issue. *See Sypolt v. Berryhill*, 2017 WL 1169706 at fn 4 (N.D. Ohio March 8, 2017) (applying SSR 16-3p retroactively); *Clayton v. Comm'r of Soc. Sec*., 2016 WL 5402963 at * 6 (E.D. Mich. Sept. 28, 2016) (applying SSR 16-3p but not directly addressing issue of retroactivity); *Carpenter v. Comm'r of Soc. Sec*., 2017 WL 1038913 at * 11 (N.D. Ohio March 17, 2017) (applying SSR 16-3p but not directly addressing issue of retroactivity). *But see Murphy v. Comm'r of Soc. Sec*., 2016 WL 2901746, at n. 6(E.D. Tenn. May 18, 2016) (declining to apply SSR 16-3p retroactively); *Withrow v. Comm'r of Soc. Sec*., 2016 WL 4361175 at fn 5 (S.D. Ohio Aug. 16, 2016) (same); *Richards v. Comm'r of Soc. Sec*., 2017 WL 892345 at fn 5 (E.D. Mich. Feb. 16, 2017); *Davis v. Astrue*, 2016 WL 5957616 at fn 2 (W.D. Tenn. Oct. 14, 2016) (same); *Baker v. v. Comm'r of Soc. Sec*., 2016 WL 4361174 at fn 2 (S.D. Ohio Aug. 16, 2016); *Scott v. Berryhill*, 2017 WL 875480 at fn 7 (E.D. Ky. March 3, 2017). The Sixth Circuit, while declining to reach the retroactivity issue, has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.' " *Dooley v. Comm'r of Soc. Sec*., 656 Fed. Appx. 113, 119 n.1 (6th Cir. 2016). The Court perceives the issue to be largely academic here; Ward nor the Commissioner makes any argument that applying SSR 16-3p over SSR 96-7p would change the outcome. As discussed above, the ALJ evaluated Ward's complaints against the objective medical evidence and did not judge Ward's character. In any event, the Court's evaluation of Ward's credibility argument

the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 834 (6th Cir. June 23, 2005).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96–7p, Purpose Section, 1996 WL 374186 (July 2, 1996); *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

---

herein would be the same applying either SSR 16-3p or SSR 96-7p.

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. §404.1529; SSR 96–7p, Purpose, 1996 WL 374186 (July 2, 1996).  Beyond medical evidence, there are seven factors that the ALJ should consider.  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ determined Ward suffered from the severe impairments of obesity, degenerative joint disease of the neck and lumbar spine, status post ankle fracture with internal fixation, gastroesophageal reflux disease, bipolar disorder, schizoaffective disorder, anxiety disorder, attention deficit disorder, attention deficit hyperactivity disorder, post-traumatic stress disorder, depressive disorder, and THC dependance.  (Tr. 109.)  The ALJ then determined these impairments could reasonably be expected to cause the alleged symptoms, however, the ALJ found Ward's statements concerning the intensity, persistence, duration and impact on functioning "are not credible or consistent with the totality of the evidence."  (Tr. 112.)  The ALJ provided the following discussion regarding Ward's allegations:

> In this case I based the decision on the medical record alone.  I found all statements by the claimant throughout this process to be completely lacking in credibility, both at the hearing and with his medical providers.  The claimant's statements contain significant inconsistencies and hyperbole, and he clearly provided false information both during the hearing, and during his interaction with medical staff.  Therefore, in reaching this decision, I relied exclusively on the objective medical evidence.
>
> With regard to hearing testimony the claimant testified that he could walk no more than twenty to thirty minutes due to longstanding ankle issues, and that he no longer considered going to school due to memory and focus issues.  (Hearing Testimony.)  When presented with his statement to a medical provider that he was jogging more, and went to JFS to discuss school, given just 14 months prior, he comfortably reported he was jogging quite a few

25

> miles at the time. (Exh. F24F, p.62). When I followed that up with the question of when was the last time he jogged, he stated two to three years ago. (Hearing Testimony). I do not know which, if any, of these mutually exclusive statements are true. This is a clear example of the complete inconsistences that are throughout the record, and reveal why the claimant's statements lack any credibility.

(Tr. 112.)

The Court finds the ALJ's credibility evaluation is not supported by substantial evidence. The ALJ's primary reason for discounting *all* of Ward's statements is based upon a March 17, 2014 treatment note with his primary care provider, Dr. Ervine. (*See* Tr. 944-947.) At that time, Ward was following up with Dr. Ervine after recently starting an ADHD medication. (Tr. 944, 950.) He indicated he was "jogging more" and had visited Job and Family Services "to discuss schooling options for being a locksmith." (Tr. 944.) At the hearing, the ALJ questioned Ward regarding this treatment note as follows:

ALJ: There's a couple of mentions in the file about going to school. I think there's one – locksmith. I thought there was one about getting a psychology degree. Have you done any school over the last couple of years?

Ward: No. I had a hard time in school. I was trying to go to community college, and it didn't work out?

ALJ: When did you last go to school?

Ward: I haven't been to school in a long time.

ALJ: And – and– a long time doesn't help me much. Do you think that's a year? Do you think that's five years? What does a long time mean?

Ward: Been many years. I couldn't go to school. I was trying to go to Lakeland for engineering, and it just didn't work out. I had a hard time concentrating and figuring stuff out then, too.

    ***

ALJ: You were there for checkup and refills. And the doctor writes a couple of notes. He says, started jogging more, doing more stuff around the house, energy

26

> improved some, and went to JFS to discuss schooling options for being a
> locksmith.
>
> Ward:  Yeah, that was a long time ago.
>
> ALJ:  So – okay, that's right at about a year ago – a little more than a year ago.  So
> how much jogging were you doing?
>
> Ward:  Quite a few miles.
>
> ALJ:  Okay.  When's the last time you went jogging?
>
> Ward:  Boy.  About two, three years ago.

(Tr. 21-22; 40-41.)

The record indicates Ward expressed a desire to become a psychologist in September

2013 and a locksmith in March 2014.  (Tr. 965, 944.)  However, he never pursued any further

schooling.  Merely visiting Job and Family Services for information does not discount his

allegations regarding his memory and focus issues, despite the ALJ's assertion otherwise.  (Tr.

112.)  Further, Ward's own doctor was skeptical of Ward's academic plans, noting his "plans

sound somewhat unrealistic considering his past."  (Tr. 965.)  Had Ward actually obtained further

education, or even attempted to attend school during the relevant period, this might have

undercut his testimony regarding focus and memory.  However, Ward did not succeed in

enrolling and completing any programs during the relevant period.  It is unclear why the ALJ felt

this "inconsistency" was enough to find Ward not credible.

The ALJ also focused on Ward's testimony regarding jogging.  (Tr. 112.)  The Court

acknowledges Ward's testimony is confusing, and frankly, inconsistent with the March 2014

treatment note.  (Tr. 40, 41, 944.)  However, the ALJ used this one example of an inconsistency

to discount all of Ward's allegations.  Assuming *arguendo* Ward overstated his physical

27

limitations in this regard, this one inconsistency is not evidence that Ward has been untruthful as to all other statements.  Ward's documented memory problems could have made it difficult for him to recall the last time he went jogging.  Moreover, while the ALJ asserts there are other inconsistencies "throughout the record," he does not point a single other instance.

The ALJ's tenuous conclusion that this one inconsistency completely destroyed Ward's credibility is not supported by substantial evidence.  The ALJ does not explain how Ward's allegations regarding his mental health[7] are "inconsistent" with his multiple, extended psychiatric hospitalizations, the need for his parents to manage his psychiatric medications, his overt fixation on Ephedra, repeated instances of "cleansing" himself with baking soda,  the inability to live independently, and recently, the need to reside in a nursing home.  (Tr. 458, 460, 455, 564, 608, 610, 685, 767, 775, 1055, 1173, 1175, 1178, 1188.)  Moreover, what is striking about the medical evidence is the apparent lack of insight Ward has into the extent of his mental health problems.  He has repeatedly attempted to take himself off his medications, and has blamed Ephedra as the cause of his issues, rather than an actual mental health disorder.  (Tr. 774, 775, 962, 1175.)  During one of his psychiatric hospitalizations, a hospital psychiatrist noted Ward did "not believe he has a mental illness."  (Tr. 1188.)  While the ALJ dismisses this behavior as mere "noncompliance" (Tr. 114.), the Sixth Circuit has acknowledged "for some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself."  *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 283 (6th Cir. 2009).  *See also Franklin v. Astrue*, 2010 WL 2667388 at *8 (S.D. Ohio June 10, 2010) ("Federal courts have recognized that a mentally ill

---

[7]    The Court notes Ward, in his brief, focuses on the credibility of his mental allegations.  This Court will similarly limit its analysis to the ALJ's credibility evaluation in the context of his mental impairments.

28

person's noncompliance with psychiatric medications can be, and usually is, the result of the mental impairment itself and, therefore, neither willful nor without justifiable excuse.")(internal citations and brackets omitted).

The Court also notes the ALJ, in assessing Ward's credibility, found Ward "clearly provided false information . . . during his interaction with medical staff." (Tr. 112.) However, the ALJ does further elaborate or point to any instances where Ward was not forthright with his medical providers. The ALJ does not explain the basis of this conclusion, and it is not supported by the substantial weight of the evidence. There is no documentation in the medical record indicating Ward was malingering or lying to his treating sources.

The Commissioner argues "this is not a case where the ALJ completely rejected Plaintiff's allegations," as the ALJ "properly evaluated [Ward's] subjective complaints and adequately accounted for" them in the RFC. (Doc. No. 12 at 16.) The Court disagrees. The ALJ, in his decision, specifically found all of Ward's statements to be "lacking in credibility" and "relied exclusively on the objective medical evidence." (Tr. 112.) However, even if the ALJ only relied on the objective medical evidence, the substantial weight of the evidence does not support the ALJ's findings as to Ward's mental limitations. The medical record indicates between Ward's February 2013 application date and the September 2015 ALJ decision, Ward had three extended psychiatric hospitalizations, consistently low GAF scores, multiple emergency room visits for various psychosomatic complaints, and used baking soda to "detox" his system. (Tr. 685, 767, 774, 775, 881, 916, 1055, 1112, 1117, 1173, 1178, 1188.) In the

decision, the ALJ did discuss Ward's multiple, extended psychiatric hospitalizations.[8]  (Tr. 114.)

However, the ALJ focused on Ward's non-compliance with his medications and his stabilization

following each hospitalization.  The ALJ fails to mention that Ward's parents often had to

manage his medications to keep him at that level of stability, and Ward was often noncompliant

due to his belief he did not have serious psychological problems.  (Tr. 455, 608, 1188.)

As the Sixth Circuit has noted, "while credibility determinations regarding subjective

complaints rest with the ALJ, those determinations must be reasonable and supported by

substantial evidence."  *Kalmbach v. Comm'r of Soc. Sec.,* 409 Fed. App'x 852, 865 (6th Cir.

2011).  Here, the ALJ's reasons for discrediting Ward's allegations are not supported by

substantial evidence.  Accordingly, the Court finds a remand is necessary to allow the ALJ an

opportunity to conduct a proper credibility analysis.

---

[8]     In describing Ward's 17-day hospitalization in July 2015, the ALJ noted "while I
considered this latest inpatient stay in assessing the claimant's functional
capacity, I gave it less weight because of his medication noncompliance and
because of the freshness of the event in light of the durational requirements of the
law."  (Tr. 114.)  The Court cannot ascertain what "durational requirments" the
ALJ is referring to, as the ALJ already found Ward met the 12-month durational
requirement when finding his mental health diagnoses severe.  It is also unclear
why the "freshness of the event" matters when considering this over two-week
long hospital stay, especially in light of the fact Ward had another two-week long
hospital stay just seven months prior.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further proceedings consistent with this decision.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: March 19, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**